THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CEDRIC LYN JOHNSON (B18840),

    Plaintiff,

v.

EVARISTO AGUINALDO

    Defendant.

Case No. 15 CV 885

Hon. Susan E. Cox

**DEFENDANT'S LOCAL RULE 56.1**
**STATEMENT OF MATERIAL FACTS**

Defendant, Dr. Aguinaldo, hereby provides the following Statement of Material Facts in support of his Motion for Summary Judgment:

EXHIBIT LIST

| | |
|---|---|
| Exhibit A | Plaintiff's February 9, 2017 Deposition Transcript |
| Exhibit B | Dr. Aguinaldo's Deposition, with attached exhibits |
| |     B.1.  Jacksonville301–302 (partially redacted) |
| |     B.2.  Johnson00032, 00036–0037 (partially redacted) |
| |     B.3.  Jacksonville401 (partially redacted) |
| |     B.4.  Jacksonville290 (partially redacted) |
| Exhibit C | Dr. Casper's Deposition, with attached exhibits |
| |     C.1.  Casper Ex. 1 (partially redacted) |
| |     C.2.  Casper Ex. 2 (partially redacted) |
| Exhibit D | Plaintiff's Second Amended Complaint |

STATEMENT OF UNCONTESTED FACTS

**A.     Introduction**

1.     Plaintiff, Cydric Lyn Johnson ("Johnson") alleges that Defendant, Dr. Evaristo Aguinaldo, improperly treated him after being assaulted by his cellmate on March 10, 2014 while incarcerated in Stateville NRC. (Exh. D, p. 1 (Nature of Action) & ¶ 10; *see also* Exh. B, 68:15–18 & 69:17–70:1).

2.     Defendant, Dr. Aguinaldo, was a physician employed at Stateville NRC (Northern Reception and Classification Center) from approximately 2008 until 2016. (Exh. B, 13:2–6).

3.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a), and venue is appropriate in this Court, as Johnson has alleged that Dr. Aguinaldo violated his Eighth Amendment rights at Stateville NRC, which is located in the Northern District of Illinois. *See supra* ¶¶ 1–2.

**B.     Johnson's pre-encounter medical conditions.**

4.     In approximately April of 1999, Johnson suffered a gunshot wound to the back of his head while he was in Bolingbrook, Illinois. (Exh. A, 13:24–14:18). Fragments of the bullet remained in Johnson's head after treatment. (Exh. A, 14:19–22).

5.     Subsequent to being shot, Johnson experienced loud ringing noises and headaches. (Exh. A, 14:23–15:6). The headaches would occur 3-4 times a week. (Exh. A, 16:10–14).

6. The headaches began a day or two after Johnson left the hospital and felt like migraines in the back of his head; the severity of pain was approximately an "8" out of a 10-point pain scale, where a "10" was the most excruciating pain that Johnson had ever felt. (Exh. A, 15:4–16; 15:22–16:6).

7. Johnson indicates that between 1999 and 2004, the headaches reduced in frequency, but was unable to articulate the amount of reduction. (Exh. A, 17:5–16; 17:20–18:3). Johnson was also unable to recall the pain severity of the headaches in 2004. (Exh. A, 18:4–7).

8. In the summer of 2004, Johnson was hit in the back of the head with a baseball bat, which put him into a coma. (Exh. A, 16:15–17:1).

9. After Johnson awoke from his coma, he noticed that his headache pain frequency had increased. (Exh. A, 18:22–19:7). Taking aspirin would help relieve the pain. (Exh. A, 19:8–13).

10. At the time that Johnson was in custody within the Illinois Department of Corrections in March 2014, he had poor vision in both eyes of approximately 20/200. (Exh. A, 20:22–21:4).

C. **Johnson's admission into Stateville NRC**

11. On March 4, 2014, Johnson was evaluated by an intake nurse at Stateville NRC. *See* (Exh. B.2, Johnson00032); *see also* (Exh. B, 41:16–42:1).

12. Based upon Johnson's medical history, including his gunshot wounds, being hit in the head with a baseball bat, and seizures, Johnson was referred

urgently for a doctor's physical examination. (Ex. D at Johnson 0032); *see also* (Exh. B, 41:16–8).

13.     Dr. Aguinaldo conducted the intake examination of Johnson on March 4th. (Exh. B, 68:15–18).

14.     Dr. Aguinaldo assessed Johson as having, among other things, a diagnosis of gunshot wound to the head and back, and a diagnosis of head trauma secondary to accident. (Ex. B. 45:13–46:12). Johnson was also documented as having poor eyesight of 20/300 in both eyes and needed glasses. *See* (Ex B. 69:6–20); *see also* Exh. B.2. at Johnson 00032.

15.     After examination, Dr. Aguinaldo prescribed several medications for Johnson and provided him a low bunk permit. (Exh. B, 68:19–69:5; Exh. B.2 at Johnson 00036).

**D.      Johnson's March 10, 2014 fight with his cellmate and Dr. Aguinaldo's treatment.**

16.     On March 10, 2014, Johnson got into a fight with his cellmate; according to Johnson, his cellmate jumped off the top bunk and started punching Johnson in his head and face and eyes because Johnson was snoring too loudly. (Exh. A, 21:19–9).

17.     Johnson held up his hands in fists in front of his face to defend himself, and began banging on the door for guards to intervene. (Exh. A., 22:10–22). The inmate stopped attacking Johnson once he started pounding on the door. (Exh. A, 24:1–6).

18. Officers arrived and escorted Johnson down to the health care unit. (Exh. A, 24:24–25:4). It took approximately 5 minutes for Johnson to be transported to the health care unit. (Exh. A, 25:5–10).

19. Within Stateville, a medical technician or nurse will first assess an offender injury and fill out an injury report documenting their findings. (Exh. B, 24:8–25:19; *see also* Exh. B.1 at Jacksonville 301–302). That individual will also determine whether the offender is to be seen immediately by a physician in the health care unit. (Exh.. B, 30:12–21).

20. In Johnson's case, he was first evaluated by a nurse who prepared his injury report. (Exh. A, 25:11–16; Exh. B.1 at Jacksonville 301–302; Exh. B, 27:11–17).

21. The evaluating nurse noted that Johnson reported bleeding from both eyes; her own assessment revealed that Johnson had suffered lacerations on both eye lids. (Exh. B.2 at Jackson 302).

22. Johnson was then brought to Dr. Aguinaldo for further examination. (Exh. B, 48:24–7; *see also* Exh. B.2 at Jacksonville 302).

23. Dr. Aguinaldo noted that Johnson had an altercation with his cellmate and was presenting with complaints of pain and left eye blurriness, that he had a superficial laceration inside the left eyelid (approximately 2-3mm in size), an abrasion around the left eye, and another abrasion under the right eye. (Exh. B, 51:18–52; *see also* Exh. B.3, Jacksonville 401).

24. Dr. Aguinaldo also noted that Johnson had a slight swelling on his forehead, and that he was not able to examine one of Johnson's eyes due to swelling. *Id.*; *see also* (Exh. B, 55:2–12).

25. Johnson did not complain of spots in his vision or of a headache. (Exh. B, 77:15–78:2).

26. After his examination, Dr. Aguinaldo planned to call Stateville's Internal Affairs department, and send Johnson for x-rays of his skull and left eye. (Exh. B, 53:7–10).

27. Dr. Aguinaldo filled out a requisition form for an x-ray to be taken of Johnson's left eye. (Exh. B, 59:24–60:3; *see also* Exh. B.4 at Jacksonville 290). In doing so, Dr. Aguinaldo noted that Johnson had a superficial abrasion or laceration of the left eye, and trauma of the forehead as a result of his fight. (Exh. B, 61:18–24; 62:22–63:6; 63:19–21).

28. Dr. Aguinaldo also ordered blood tests for Johnson, including tests for HIV and tetanus, and prescribed Johnson with Neosporin/Polysporin/Bacitracin ointment for Johnson to apply to his left eye two times a day for five days. (Exh. B, 53:11–16).

29. Dr. Aguinaldo also ordered Johnson to receive an ice compress and Tylenol. (Exh. B. 53:20–22). He set Johnson for a follow up in two days with an available provider in the health care unit (physician, physician's assistant, or a nurse practitioner), or as Johnson otherwise needed. (Exh. B., 53:16–19; *see also* 34:2–9 & 55:13–5).

30. He ordered the ice compress to help with swelling, the Tylenol to help with pain, the Neosporin/Polysporin/Bacitracin ointment to treat the abrasion or the cuts on his left eye, and the tetanus shot prophylactically due to the danger of infection from the broken skin. *See* (Exh. B, 54:8–54:14; 72:20–73:9).

31. Dr. Aguinaldo's order for follow-up was to ensure that Johnson's symptoms had improved, stayed the same, or gotten worse. (Exh. B, 72: 6–19). Johnson also could have come into the health care unit earlier if he wanted. *Id.*

32. When he issued his orders concerning the diagnostics and treatment for Johnson, Dr. Aguinaldo was relying on, and anticipated, other medical staff personnel to carry out the orders and plans. (Exh. B, 78:15–19; 79:10–79:13).

33. Specifically, other staff members are responsible for scheduling appointments, filling prescriptions, and administering medications. (Exh. B, 78:20–9).

34. The healthcare unit staff at Stateville NRC operates as a unit, and there is not an assigned physician to a particular patient; rather, all members of the health care unit can pick up and continue care for a given patient. (Exh. B, 74:10–21).

35. Though Johnson saw other medical providers subsequent to March 10th, Dr. Aguinaldo did not encounter Johnson after March 10, 2014. (Exh. B, 66:1–19; 78:11–14); (Exh. A, 29:11–15).

36. Johnson subsequently had an x-ray taken, and the radiologist, Dr. Leef interpreted the results on March 11, 2014. (Exh. B, 71:7–10). Dr. Leef found no new

acute injuries seen on the x-rays, but he saw bullet fragments lodged in Johnson's head. (Exh. B, 71:11–22).

37. Johnson was subsequently seen by a physician's assistant on March 14, 2014. (Exh. B, 4:22–75:3).

38. The physician's assistant documented that Johnson self-reported improvement in his eye condition. (Exh. B, 76:18–77:1). The PA provided Johnson with several medications, including Naprosyn, an anti-inflammatory that reduces pain and swelling. (Exh. B, 75:23–76:6). The PA also referred Johnson to an optometrist located at Stateville. (Exh. B, 76:7–76:17).

**E.     Subsequent Treatment**

39. After Johnson's swelling had gone down in his face, he noticed three white, small spots in his left eye; the spots move around every day, but otherwise have not changed. (Exh. A, 27:17–29:2).

40. Johnson's headaches became worse sometime after he was placed in segregation for the fight. (Exh. A, 29:3–29:10; Exh. A, 29:21–30:5). The headaches were like what he felt after he was hit with the baseball bat in 2004. (Exh. A, 29:6–10).

41. Since feeling the increased severity of pain after the fight, Johnson's headaches are intermittent, but have not changed in terms of severity. (Exh. A, 54:7–54:24).

42. Johnson was transferred to Vienna Correctional Center in May 2014. (R. 31:24–4). He was released from that period of incarceration in 2015, re-

incarcerated for a subsequent period of time, and then released again in 2016. (Exh. A, 35:9–13; 37:8–12; 44:17–45:5).

43. Johnson has seen two doctors regarding his headaches and eye issues: Dr. Metha (physician) and Dr. Casper (optometrist). Johnson advised that he would tell Dr. Metha and Dr. Casper about any symptoms that he had, and had no complaints about Dr. Metha or Dr. Casper's care. (Exh. A, 46:20–47:9).

44. Dr. Metha, prescribed Johnson with barbiturates, which assist Johnson a little bit with the pain, but the frequency of the headaches has unchanged. (Exh. A, 55:1–14).

45. Johnson saw Dr. Casper in August 2016 for an eye examination. Dr. Casper is licensed as an optometrist in Illinois. (Exh. 28:18–28:22). Johnson advised at the examination that he had blurred vision, far and near, with migraines and a blind spot in his left eye since 2014. (Exh. C, 20:23). Johnson was noted to have 20/200 vision. (Exh. C, 5:7–22).

46. However, the examination was halted unexpectedly when Johnson left Dr. Casper's office in the middle of the examination. (Exh. C, 4:15–5:6). From what Dr. Casper was able to examine during the interrupted visit, Johnson's optic nerve, and whatever else could be visualized, seemed to be normal. (Exh. C, 8:3–22).

47. Johnson returned to Dr. Casper in August 2017 for additional examination after Dr. Casper was contacted by Johnson's attorney regarding the results of the August 2016 examination. (Exh. C, 13:1–19).

48. During the August 2017 examination, Johnson was seen to have 20/400 vision. (Exh. C, 13:20–14:3).

49. Johnson was also measured to have a very limited central visual field of 5 degrees in his right eye, with even worse results in his left eye. (Exh. C, 16:15–17:5). The typical result for a central visual field is 70-80 degrees. (Exh. C, 17:3–6).

50. The visual field test is subjective, where the patient must keep his eye on a specific point and then respond to lights that appear randomly on the peripheries of the patient's vision. Results are based on the honest participation and reporting by the patient. (Exh. C, 15:9–16:14).

51. Dr. Casper recalls that there were some problems with Johnson's visual field testing, in that Johnson had to be consistently reminded to look straight ahead and not sleep. (Exh. C, 26:21–27:7).

52. Upon physical examination, Dr. Casper assessed that there were no injuries present to the internal or external portion of Johnson's eye. (Exh. C., 18:9–11).

53. Based upon the results of the visual field test and his physical examination, Dr. Casper assessed Johnson as having an optic nerve deficit beyond the retina and beyond the eye. (Exh. C, 18:12–19:10).

54. Traumatic injuries, such as being shot, or being hit with a baseball bat, in the back of the head, could explain Johnson's visual field deficit. (Exh. C, 19:23–20:23). An injury to the back of the head could cause injury to the visual cortex, which is also located in the back of the head. (Exh. C, 20:10–23).

55. A trauma to the back of the head could cause an optic nerve deficit beyond the eye. (Exh. C, 21:4–21:23).

56. There is no currently available medical process to reverse or intervene in a traumatic injury causing injury to the optic nerve. (Exh. C, 21:24–22:23). Rather, the patient just needs to adjust to their new circumstances. (Exh. C, 22:66–13).

### G. The propriety of Dr. Aguinaldo's treatment of Johnson

57. Johnson does not have any medical training. (Exh. A, 12:13).

58. In Dr. Aguinaldo's medical judgment, any resultant injury to Johnson was a result of the nature of the fight he was in, rather than any treatment that he provided to Johnson. (Exh. B, 81:21–82:5).

59. In Dr. Aguinaldo's medical judgment, Johnson's medical condition was appropriately addressed in the treatment and diagnostic orders that he placed for Johnson after seeing him on March 10, 2014. (Exh. B, 81:12–19).

Respectfully submitted,

/s/ Chad M. Skarpiak
Chad M. Skarpiak
CUNNINGHAM, MEYER & VEDRINE, P.C.
1 East Wacker Drive, Suite 2200
Chicago, Illinois 60601
Tel: (312) 578-0049
Fax: (312) 578-0247
E-Mail: cskarpiak@cmvlaw.com

## Certificate of Service

The undersigned attorney hereby certifies that on February 23, 2018, he electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

The undersigned further certifies that on February 23, 2018, a true and correct copy of the foregoing was mailed via First Class Mail, postage pre-paid, to:

**Cedric Lyn Johnson**
**7801 Boxwood Lane**
**Plainfield, Illinois 60586**

/s/ Chad M. Skarpiak