**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION
 3
       CEDRIC LYN JOHNSON,    )
 4                           )
              Plaintiff,     )
 5                           )
           vs.              )  No. 15 CV 885
 6                           )
       EVARISTO AGUINALDO,    )
 7                           )
              Defendant.    )
 8
 9
10          The Deposition of
11     EVARISTO AGUINALDO, M.D., taken before
12     RENEE C. KERR, Certified Shorthand Reporter,
13     in the State of Illinois, County of Cook, at
14     Stateville Correctional Center, 16830 Broadway
15     Street, Joliet, Illinois, on the 11th day of
16     July, A.D., 2017, at 1 o'clock p.m.
17
18
19
20     Reported By:  Renee C. Kerr
21     License Number:  084-001508
22
23
24
```

**Page 2**

```
 1     APPEARANCES:
 2     BRYAN CAVE,
       BY:  MR. STEVEN G. TRUBAC,
 3          161 North Clark Street
            Chicago, Illinois  60601,
 4          312.602.5000,
 5          on behalf of the Plaintiff;
 6
       CUNNINGHAM, MEYER & VEDRINE, PC,
 7     BY:  MR. JOEL M. KOPPENHOEFER,
            One East Wacker Drive, Suite 2200,
 8          Chicago, Illinois  60601,
            312.578.0049,
 9
            on behalf of the Defendant.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1                    INDEX
 2     Examination of EVARISTO AGUINALDO, M.D.
 3     By Mr. Trubac          Page 6
       By Mr. Koppenhoefer    Page 68
 4     By Mr. Trubac          Page 83
 5     EXHIBITS
 6     Exhibit 1              Page 24
       Exhibit 2              Page 38
 7     Exhibit 3              Page 48
       Exhibit 4              Page 59
 8     Exhibit 5              Page 65
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1          (The witness was duly sworn.)
 2          MR. TRUBAC:  Good afternoon, Doctor.
 3      Would you please state your name
 4   for the record.
 5          THE WITNESS:  My name is Evaristo
 6   Aguinaldo, Jr.
 7          MR. TRUBAC:  Let the record reflect
 8   this is the deposition of Defendant,
 9   Dr. Evaristo Aguinaldo, in Case Number
10   15 CV 885, Johnson v. Aguinaldo, currently
11   pending in the United States District Court in
12   the Northern District of Illinois, taken
13   pursuant to Notice and agreement of the
14   parties and pursuant to the Federal Rules of
15   Civil Procedure and all local rules.
16          Doctor, my name is Steve
17   Trubac.  I am the counsel for the Plaintiff in
18   this matter.  Dr. Aguinaldo -- am I
19   pronouncing that correctly?
20          THE WITNESS:  Aguinaldo, or
21   whatever.
22          MR. TRUBAC:  (Continuing) -- have you
23   ever had your deposition taken before?
24          THE WITNESS:  Yes, sir.
```



EVARISTO AGUINALDO, M.D.                                July 11, 2017
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO                    5–8

Page 5

1          MR. TRUBAC:  When was the last time?
2     THE WITNESS:  The last time?  I don't
3  know.  Several years ago.
4          MR. TRUBAC:  How many times have you
5  had your deposition taken?
6     THE WITNESS:  Five, ten, 15 times.
7          MR. TRUBAC:  And what types of cases
8  were they?
9          Were you a Defendant in them?
10         THE WITNESS:  I don't recall.  I
11  don't recall the situation.
12         MR. TRUBAC:  So because it has been a
13  few years, I am going to go over the basics
14  again very quickly.
15         I will ask you a series of
16  questions and ask you about some documents
17  that I brought with me.  It is very important
18  that you allow me to finish my questions
19  before you answer so that the court reporter
20  can get everything down and so your counsel
21  can object to something if he wants to.
22         If you don't understand a
23  question, please let me know; and, I will
24  rephrase it.  Otherwise, I will assume that

Page 6

1  you understood the question and answered
2  accordingly.
3          If you need a break, let me
4  know, and we will take a five minute break.
5          Finally, your testimony today is
6  under oath so it has the same force and effect
7  as if you were testifying in court.
8     THE WITNESS:  Correct.
9          EVARISTO AGUINALDO, M.D.,
10  called as a witness herein, having been first
11  duly sworn, was examined and testified as
12  follows:
13         E X A M I N A T I O N
14  BY MR. TRUBAC:
15    Q   Dr. Aguinaldo, is there any
16  medication or health condition that would
17  impair your ability to understand my questions
18  or have your deposition taken today?
19    A   No.
20    Q   Are you familiar with the lawsuit
21  that brings us here today?
22    A   I think so.
23    Q   Johnson v. Aguinaldo.
24         Have you read the Complaint?

Page 7

1     A   What?
2     Q   Have you read the Complaint in this
3  lawsuit?
4     A   Yes.  I've read the Complaint.
5     Q   Are you aware of the allegations that
6  are being made against you?
7     A   Yes.
8     Q   So you are familiar with the
9  Complaint?
10    A   Right.
11    Q   Did you speak with anyone other than
12  your attorney in preparing for this
13  deposition?
14    A   No.
15    Q   Did you review any documents in
16  preparing for this deposition?
17    A   I did read documents.
18    Q   And which documents did you review
19  without getting into --
20    A   Pertaining to this case.
21    Q   Medical records?
22    A   Right.
23    Q   Pertaining to the Plaintiff,
24  Mr. Johnson?

Page 8

1     A   Correct.
2     Q   So before we get into the allegations
3  of the Complaint, I just want to ask you some
4  background questions.
5          Doctor, where were you born?
6     A   Where was I born?
7     Q   Yes.
8     A   Philippines.
9     Q   How long did you live there before
10  moving to the United States?
11    A   Probably about 30 years.
12    Q   When did you move to the United
13  States?
14    A   1975, '75 or '74.
15    Q   So you have a medical degree,
16  correct?
17    A   From the Philippines.
18    Q   Where did you go to medical school?
19    A   In Manila, Central University.
20    Q   When did you graduate?
21    A   1972.
22    Q   And you graduated with a degree --
23  what degree did you get?
24    A   Doctor of Medicine.

ESQUIRE
DEPOSITION SOLUTIONS

**EXHIBIT B**

EVARISTO AGUINALDO, M.D.                                July 11, 2017
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO            9–12

Page 9

1    Q    Where did you do your residency?
2    A    In the Philippines, 1972, Manila
3  Medical Center; and, here in the states from
4  1976 to 1979 in Norwegian American Hospital in
5  Chicago, Illinois.
6    Q    Have you been practicing medicine
7  since you came out of residency?
8    A    Yes, sir.
9    Q    And in what general area?
10   A    Mostly general practice on the south
11 side of Chicago.
12   Q    South side of Chicago?
13   A    Correct.
14   Q    Are you Board certified in any areas
15 of medicine?
16   A    No, sir.
17   Q    What did you do your residency in;
18 what area of medicine?
19   A    General practice.
20   Q    Both in the Philippines and United
21 States?
22   A    Yes.
23   Q    So you mentioned that you -- do you
24 have a practice, a private practice on the

Page 10

1  south side of Chicago?
2    A    Yes, sir, from 1979 to 1980 to 2000,
3  2001.
4    Q    And that was just general practice?
5    A    General practice.
6    Q    Who is your current employer?
7    A    69th and Wentworth.
8    Q    I'm sorry. Who is your employer?
9  Who do you work for?
10   A    When I was in private practice?
11   Q    Right now.
12   A    Wexford.
13   Q    Wexford Health Sources?
14   A    Right. Wexford.
15   Q    And do you have a contract with
16 Wexford?
17   A    Yes. There is a contract.
18   Q    How long have you worked for Wexford?
19   A    I think we started like about 19 --
20 either '74 or '75.
21   Q    You started working for Wexford?
22   A    Correct.
23   Q    So there was an overlap where you had
24 a private practice and you were also working

Page 11

1  for Wexford?
2    A    Right. But between that there was
3  another contractor, between 1970 and '75,
4  another company that take care of the prison.
5        MR. KOPPENHOEFER: Steve, I think he
6  is thinking about their contract with the
7  State and his own.
8  BY MR. TRUBAC:
9    Q    Oh, okay. Let me clarify the
10 question.
11       I know Wexford has a contract
12 with Illinois to provide services. Do you
13 personally have a contract with Wexford, like
14 an employment contract?
15   A    Yes, sir. There is.
16       MR. KOPPENHOEFER: You mean a written
17 contract?
18       THE WITNESS: We signed a contract
19 with Wexford.
20       MR. KOPPENHOEFER: You did?
21       THE WITNESS: Yes.
22       MR. KOPPENHOEFER: Sorry.
23 BY MR. TRUBAC:
24   Q    What are you contracted to do for

Page 12

1  Wexford?
2    A    I don't remember specifically what
3  the contract was.
4    Q    What do you do generally for Wexford?
5    A    It is like a general practice. It is
6  seeing and treating patients and prescribing
7  medication.
8    Q    Is that just in Illinois prisons; or,
9  is it also in other areas?
10   A    Just in Illinois.
11   Q    So do you currently practice just at
12 Stateville; or, are there other prisons that
13 you go --
14   A    I go once in a while to DuPage County
15 Jail like every Wednesday, three or four times
16 a month.
17   Q    But, otherwise, you are here?
18   A    Otherwise, I am here.
19   Q    What are your general hours?
20   A    At Stateville?
21   Q    Yes.
22   A    8 to 4.
23   Q    So I think I understand that you
24 currently work out of Stateville, correct?

EXHIBIT B

EVARISTO AGUINALDO, M.D.                               July 11, 2017
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO            13–16

Page 13

1    A    Correct.
2    Q    You worked at Stateville NRC previous
3    to this, I believe, correct?
4    A    Yes, I did.
5    Q    When was that?
6    A    I think 2008 until last year.
7    Q    Why did you move?
8    A    I don't know.  It is up to them.
9    They can move us anytime they want.
10   Q    Where did you work before Stateville
11   NRC?
12   A    Here.  Stateville proper.  Here.
13   Q    So how long have you worked at
14   Stateville whatever you might call it?
15   A    Probably from 2004, 2005 to the
16   present time?
17   Q    Where did you work before that?
18   A    I was still in Stateville, but
19   different company at that time.  I think it
20   was about three companies before it was
21   Wexford.
22   Q    So am I correct that you are
23   essentially a general practitioner for inmates
24   at Stateville?

Page 14

1    A    Correct.
2    Q    Do you only examine inmates; or, do
3    you also examine staff members maybe?
4    A    Inmates most of the time.
5    Q    Is there a medical facility in
6    Stateville that you will actually examine
7    patients in, or do you actually --
8    A    There is a healthcare unit over
9    there.
10   Q    And is that healthcare unit both for
11   Stateville proper and NRC?
12   A    No.  They have their own separate
13   healthcare unit in NRC and Stateville proper.
14   Q    So the allegations in this Complaint
15   are mainly in 2014.
16        So in 2014, I understand that
17   you were working at NRC, correct?
18   A    Correct.
19   Q    NRC had its own healthcare unit,
20   correct, or has its own healthcare unit?
21   A    Correct.
22   Q    Dr. Aguinaldo, do you have just a
23   general idea of how many patients a day you
24   see these days here in Stateville?

Page 15

1    A    Here right now?
2    Q    Yeah.
3    A    It is basically probably about 20, 25
4    a day.
5    Q    And are those usually initial like
6    intake visits, or follow-up visits, or are
7    they a combination of the two?
8    A    Are you talking about here now; or,
9    on the other side at NRC?
10   Q    Here right now.
11   A    Usually, follow-up visits.
12   Q    Just for follow-up visits?
13   A    Some follow-up visits.  Some also
14   sick call.
15   Q    Sick calls?
16   A    Right.
17   Q    And what about in 2014 when you were
18   in NRC?
19   A    It was usually mostly intake.
20   Q    Mostly intake?
21   A    Yes.
22   Q    Would you do any follow-up visits at
23   NRC?
24   A    Correct.

Page 16

1    Q    You would?
2    A    Yes.  We do follow-up and intake at
3    NRC.
4    Q    So you do follow-up and intake visits
5    at NRC?
6    A    Right.
7    Q    So you said currently you see maybe
8    about 20, 25 patients a day, something like
9    that?
10   A    NRC?
11   Q    No, today.
12   A    Something like that.  Probably 15 to
13   25.  Let's put it that way.
14   Q    What about in 2014?  Was there a
15   different number because it was a different
16   facility?
17   A    It was probably more or less the
18   same; but, probably -- more or less the same.
19   Q    More or less the same, okay.
20        So I want to get into your
21   experience at NRC in 2014.  So, basically, all
22   of my questions from here on in are going to
23   be about your practice as a general
24   practitioner at NRC in 2014, 2015.

EVARISTO AGUINALDO, M.D.                                July 11, 2017
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO              17—20

Page 17

1          Do you understand?
2    A    Right.  I understand.
3    Q    Great.  Excellent.
4          In your experience when you were
5    working at NRC, did all inmates who requested
6    or required medical attention, were they seen
7    by a medical doctor?
8    A    Yes.
9    Q    And by that -- I just want to make
10   sure I am clear -- a medical doctor as opposed
11   to like a registered nurse, or physician's
12   assistant, or something like that.
13   A    Yes.  They have to be seen by a
14   medical doctor.
15   Q    They have to be seen by a medical
16   doctor?
17   A    Correct.
18   Q    Is that a regulation by the State, or
19   a Wexford regulation?
20   A    I don't understand.
21   Q    I will rephrase it.
22          Why are inmates required to see
23   a medical doctor?  Is there a certain -- is
24   there a certain regulation that requires you

Page 18

1    to do that?
2    A    Well, when they come to intake,
3    everybody has to be seen.
4    Q    When you say intake, are you talking
5    about when they first come into the prison, or
6    when they have a medical condition, and they
7    come in for a visit?
8    A    When they first come from the county
9    jail, they come for intake, they come for
10   screening.
11   Q    I think I may be using a term
12   incorrectly before.  I'm sorry.
13          So by intake, you mean when they
14   come into the prison and have their original
15   physical exam, if you will?
16   A    Correct.
17   Q    What about when an inmate is already
18   in Stateville at NRC, they have already had
19   their intake, and then they get into a fight,
20   or they have some medical condition and they
21   need medical attention.  Are all inmates who
22   go to the NRC healthcare unit, are they all
23   seen by a medical doctor?
24   A    Correct.

Page 19

1    Q    Yes?
2    A    Yes.
3    Q    Are they all -- are all inmates who
4    go to the healthcare unit originally seen
5    by -- first seen by a medical doctor; or, is
6    there like a screening process?
7    A    There is a screening process when
8    they come from the county jail.  They screen
9    them out.
10   Q    I'm sorry.  Let's move past the
11   original intake.
12          So say an inmate has a medical
13   condition, and say they got into a fight, and
14   they need stitches or something.  They go to
15   the healthcare unit.
16   A    If there is a fight you said?
17   Q    Sure.  Let's assume there is a fight,
18   and it looks like they need stitches.  They go
19   to the healthcare unit.
20          Is there a screening process
21   there where maybe first they are seen by a
22   registered nurse or physician's assistant
23   before being seen by a medical doctor?
24   A    The first responder would be a med

Page 20

1    tech and the nurses, and they bring them to
2    the healthcare unit.
3    Q    So the registered nurse or
4    physician's assistant will respond initially;
5    and, then --
6    A    They will see the med tech first or
7    the nurses.  Then they bring them to the
8    healthcare unit.
9    Q    When they are brought to the
10   healthcare unit, is that when a medical doctor
11   will examine them?
12   A    Yes.  That is when they examine them,
13   when they bring them to the healthcare unit.
14   Q    Dr. Aguinaldo, how many medical
15   doctors, if you remember, were there at NRC in
16   July of 2014?
17   A    Including medical director?
18   Q    No.  Just medical doctors.  Someone
19   with a degree like you.
20   A    Around two.  Including me, two, or
21   three sometimes.  Because I am the full time
22   over the nurses at the time, and there is a
23   part-timer, and I don't know whether we have
24   other contractors at that time.


EXHIBIT B

EVARISTO AGUINALDO, M.D.                                July 11, 2017
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO            21–24

Page 21

1    Q    So you were a full-time physician at
2    NRC, and there may have been a few other
3    part-time medical doctors?
4    A    Correct.
5    Q    Would you overlap in your shifts
6    sometimes; or, you know, when you were
7    working, you were the only medical doctor
8    there, and then there was a part-time worker
9    who was there?
10        Do you understand my question?
11   A    No. I don't understand your
12   question.
13   Q    So you said you were full time at
14   NRC, and there were a few part-time
15   physicians.
16        When you were doing your shift,
17   were you the only medical doctor on call, or
18   were there other medical doctors there as
19   well?
20   A    When you said on call, it is the
21   medical director that gets the call.
22   Q    Okay.
23        So when you -- during your
24   shifts -- because you said you worked from

Page 22

1    8 to 4, correct?
2    A    Correct.
3    Q    Is that true also when you were at
4    NRC?
5    A    Correct, yes.
6    Q    So from 8 to 4, were you generally
7    the only medical doctor who was at the
8    healthcare unit at NRC?
9    A    Generally. Some part-times come on
10   different days.
11   Q    So let's actually go back to -- let's
12   go back to the general intake, which -- when
13   an inmate may be transferred to Stateville or
14   needs a general intake.
15        Do you perform those initial
16   physical examinations?
17   A    Only if they have medical problem
18   that has medical issue when they go to
19   intake.
20        If they come with high blood
21   pressure, or anything like that, then there is
22   other guy who has to see them at intake so we
23   can prescribe medication. Otherwise, we
24   don't. They come in at another time.

Page 23

1    Q    So if an inmate has a condition that
2    is already known about, then you will see them
3    for intake?
4    A    Right. We see them if they have
5    medical issue. We see them at intake.
6    Q    What if someone doesn't have a
7    medical issue?
8    A    If they don't have a medical issue,
9    then we will see them at another time for
10   physical examination.
11   Q    Are you familiar with an Illinois
12   Department of Corrections form called an
13   offender injury report?
14   A    I'm not really familiar with it, but
15   I have seen it before.
16        MR. TRUBAC: You have seen it
17   before. Okay.
18        I am going to hand you a
19   document that was produced to us by your
20   counsel. I would like to mark it as
21   Exhibit 1.
22        I would like you to review this
23   document and then let me know when you have
24   reviewed it. It is three pages, I believe.

Page 24

1        (Document marked Exhibit 1
2        for Identification.)
3    BY MR. TRUBAC:
4    Q    Dr. Aguinaldo, do you recognize this
5    document now that you have had a chance to
6    review it?
7    A    Right. I recognize this one.
8    Q    So when I was previously talking
9    about an offender injury report, this is the
10   type of form I was talking about. So you do
11   recognize this type of form?
12   A    Correct.
13   Q    How often do you see these?
14   A    Depends. If there is some kind of
15   injuries like that, then we see them.
16   Q    What are these used for?
17   A    These injury reports are made by the
18   med tech or the nurses.
19   Q    And what is a -- like medical
20   technician?
21   A    Medical technician, right.
22   Q    So is this something where the nurses
23   or the med tech would respond to an incident
24   or something and they would write this out?



**EXHIBIT B**

EVARISTO AGUINALDO, M.D.
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO

July 11, 2017
25–28

Page 25

1    A    Correct.
2    Q    What happens after they write this
3    out?  What happens next?
4    A    Well, they tell us that there is some
5    guy that is injured, so they tell us we have
6    to summon them.  When they make an injury
7    report, they talk to us sometimes.  It's not
8    most of the time.  Sometimes.  Sometimes we
9    have to see this guy because sometimes they
10   make their own decision that they don't need
11   to be seen by doctor.  They can be seen the
12   following day.
13   Q    So the nurse, or the med tech, or
14   the -- do physician assistants ever fill these
15   out?
16   A    What do you mean?
17   Q    So you mentioned that nurses may fill
18   out these forms?
19   A    Either the nurses or med techs.
20   Q    Are you familiar with physician
21   assistants?
22   A    There are physicians assistants here,
23   too.
24   Q    And they may fill out these forms as

Page 26

1    well?
2    A    Normally, no.
3    Q    So either the nurse or med tech would
4    then do an initial evaluation; and, they would
5    make the determination of whether or not the
6    inmate needed to be seen by the medical doctor
7    immediately; is that correct?
8    A    Yes.
9    Q    Can you turn to the second page of
10   this document.
11        Actually, let me ask you a
12   question.
13        I know this was a number of
14   years ago, but do you remember in 2014
15   reviewing this document?
16   A    No.  I don't remember.
17   Q    About how many of these do you think
18   you have seen maybe per week of these
19   documents?
20   A    Per week, very seldom.
21   Q    Seldom?
22   A    Very seldom.
23        Not a couple a week.  Maybe a
24   couple a month.

Page 27

1    Q    Is that because most of the time the
2    nurse or med tech doesn't say that follow-up
3    with the medical doctor is required?
4    A    Probably.
5    Q    But if they do say that a follow-up
6    with a medical doctor is required, then you or
7    one of the other medical doctors at the
8    healthcare unit would see this document,
9    correct?
10   A    Correct.
11   Q    So let's go to the second page of the
12   document.
13        It looks like this document was
14   signed by Marian Andrews who is a registered
15   nurse.
16        Do you know Marian Andrews?
17   A    I don't remember her before.
18   Q    And so this document is dated
19   March 10, 2014.
20        Under P, in the middle of the
21   page, you see where it says treatment and
22   follow-up?
23   A    Yes.
24   Q    Am I correct in understanding that

Page 28

1    that means follow-up with M.D.?
2    A    Yes.
3    Q    So F slash U means follow-up?
4    A    Yes.
5    Q    And M.D. means medical doctor?
6    A    Right.
7    Q    Now on the bottom of the page there
8    is a section that says to be completed by
9    physician.
10        Do you see that?
11   A    Yes, sir.
12   Q    And what exactly is this portion
13   right here?
14   A    This is just like a form whenever
15   somebody is injured.  So it is up to them to
16   see whether we see them immediately, or have
17   them appear in sick call.  So at this time,
18   when -- probably at this time, I really don't
19   recall this thing that either he made first,
20   or I see him first at the healthcare unit.
21   Q    Okay.  So let me make sure I
22   understand.
23        First of all, is that your
24   signature on the bottom of the page?



EXHIBIT B

EVARISTO AGUINALDO, M.D.
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO

July 11, 2017
29–32

Page 29

1    A    Yes.
2    Q    And is that dated March 10, 2014?
3    A    Correct.
4    Q    That is the same date as the document
5    that was signed by Marian Andrews?
6    A    Correct.
7    Q    So this says, I have reviewed this
8    report and would like to see this offender
9    immediately, correct?
10    A    Correct.
11    Q    The immediately box is checked?
12    A    Correct.
13    Q    Did you check that box?  Do you
14    recall?
15    A    I don't recall.
16    Q    Are you formally the one who would
17    review these reports and then look at the
18    bottom of the page and make a determination of
19    which box to check?
20    MR. KOPPENHOEFER:  You mean a report
21    that he signed off on, or all the reports?
22    BY MR. TRUBAC:
23    Q    So, specifically, for this type of
24    report, when a registered nurse maybe says --

Page 30

1    they come up with this report and they say the
2    inmate needs a follow-up with an M.D., and
3    then it goes to you, do you fill out the
4    bottom of the form?
5    A    I really don't recall whether I sign
6    it after I see him or before I see him.  I
7    don't recall; but, I recall I see inmate on
8    that day, but I don't recall whether I was
9    signing either before or after.
10    Q    Let's forget about this specific
11    one.
12    Generally speaking, when you see
13    these, do you fill out the bottom of this form
14    before you see the inmate?
15    A    Not necessarily because sometimes it
16    depends.
17    It is just like, as I said
18    again, because it is up to them really.
19    Q    I'm sorry.  Up to who?
20    A    Up to the nurses whether he has to be
21    seen right away or appear in sick call.
22    Q    But, regardless, either before or
23    after you have seen an inmate, at some point
24    you would fill out this form and check one of

Page 31

1    these boxes, correct?
2    A    Correct.
3    Q    So when it says, I would like to see
4    this offender immediately, is that just
5    generally because the registered nurse has
6    said that follow-up needs to be done by an
7    M.D.?
8    A    Not really.
9    As I said, again, no matter when
10    they bring us the inmate, when there is a
11    fight, I don't see a report like this.  They
12    put them in the healthcare unit and we summon
13    them.  So I don't know if it was before or
14    after I sign it, but I signed this one.
15    Q    So you may not even see this report
16    until after you have examined the inmate?
17    A    Possible.
18    Q    If you didn't see a report like this,
19    which has subjective findings and objective
20    findings at the top, which looks to be the
21    initial report of the registered nurse, where
22    would you get your information as to what the
23    issue was with the inmate or what needed to be
24    done?

Page 32

1    A    Probably when I see this inmate in
2    the healthcare unit.  As I said, I don't
3    recall before or after.  I don't recall, but I
4    see inmate over there.
5    Q    Who would tell you what the problem
6    was?
7    So an inmate comes to the
8    healthcare unit, and --
9    A    Anybody.  Med tech, nurse, like that;
10    and, usually what they tell us is, Doctor, you
11    forgot to sign the injury report.
12    Q    So it is probably the nurse or med
13    tech who filled out this form who will then go
14    with the inmate to the healthcare unit and
15    then tell you what happened, why they think a
16    follow-up is --
17    A    Sometimes.  But not most of the
18    time.
19    As I said again, injury report
20    is either you see them before or after you see
21    the patient already.  Then they will tell you,
22    Doctor, you forget to sign the injury report.
23    Q    I am just trying to understand where
24    you get your information as to why this


EXHIBIT B

EVARISTO AGUINALDO, M.D.
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO

July 11, 2017
33—36

Page 33

1  particular inmate needs to be seen, what
2  happened, what medical issues there may be.
3      A   Most of the time, as I said, they
4  bring the inmate to the healthcare unit, and
5  they tell you some kind of finding.  Then you
6  go in, and they are waiting right there to see
7  you.
8          MR. KOPPENHOEFER:  I think what he is
9  trying to tell you is he walks in the
10  examination room, and there is an inmate
11  waiting to see him.  Somebody has put him in
12  there.
13          MR. TRUBAC:  Is that accurate,
14  basically?
15          THE WITNESS:  Yes.
16  BY MR. TRUBAC:
17      Q   So it's possible you may go into the
18  examination room and you don't have any idea
19  what has happened until you talk to the
20  inmate?
21      A   That's correct.
22      Q   What if the inmate is unconscious or
23  something?
24      A   Well, the nurses will see something

Page 34

1  sometimes.
2      Q   And for my own knowledge, what is
3  this PRN at the bottom of the form?
4      A   PRN means whenever they want to come;
5  or, there is no specific date that they come.
6  PRN is whenever they want to come.
7          MR. KOPPENHOEFER:  It means as
8  needed.
9          THE WITNESS:  As needed.
10  BY MR. TRUBAC:
11      Q   So I think we have sort of exhausted
12  this document, but to sort of reiterate, at
13  some point you would sign off on these
14  documents, whether it is before you saw the
15  inmate, after you saw the inmate, you would
16  sign the bottom of this form, correct?
17      A   At some point.
18      Q   At some point?
19      A   At some point.
20      Q   And before you signed the form, would
21  you make sure you read the report in its
22  entirety, or would you just sign it?
23      A   I'd just sign it because, as I said,
24  I must have seen already this patient before I

Page 35

1  make the injury report.
2      Q   So when you see an inmate going into
3  the examination room, do you ever -- is it
4  your general practice to review their medical
5  history before actually examining them?
6      A   Sometimes.  Because most of the time
7  they don't have the record when they bring to
8  us in healthcare unit.  They don't have the
9  record.  Sometimes.
10      Q   The record maybe exists, but they
11  just didn't bring it with them?
12      A   If they bring the record, you can see
13  it like that.  Most of the time, just like
14  this case, most of the time they just bring
15  the inmate to the healthcare unit, and we just
16  see them already and talk to them what
17  happened, but we don't have the record
18  sometimes.  Not most of the time.
19          It's not like in sick call where
20  there is a record there.
21      Q   Okay.  So my understanding would be
22  that because this is sort of like a -- not a
23  scheduled visit, you don't necessarily have
24  access to their full medical history; is that

Page 36

1  correct?
2      A   That's correct.
3      Q   Is there -- if you had access to the
4  medical history, would you make sure to review
5  it before examining the patient?
6      A   Correct.
7      Q   So if the registered nurse or med
8  tech brought the medical history with them,
9  you would review that before examining the
10  inmate?
11      A   Correct.
12      Q   Do you -- in cases where you don't
13  have access to the medical history when the
14  inmate is brought to you, do you review it
15  after you see the inmate or no?
16      A   Sometimes we don't even have the
17  record.  So we get the paper, and we just
18  write on a piece of paper like that.
19      Q   So what I am asking is if you don't
20  have the medical history at the time of the
21  examination, after you have already seen the
22  inmate and you are writing up your notes, do
23  you then try to actually request the medical
24  history to review it or no?



**EXHIBIT B**

EVARISTO AGUINALDO, M.D.                                    July 11, 2017
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO                    37–40

Page 37

1   A   If there is, or I could just ask the
2   patient himself.
3   Q   So if you don't have access to the
4   medical history, do you always -- what sorts
5   of background questions do you make sure to
6   ask inmates?
7   A   In this case, just like him at that
8   time, I know nothing about him.  All I know is
9   the guy is fighting.  So I go in the room to
10  examine him and ask him if he has any other
11  issues.
12  Q   So you examine him, but do you ask
13  him if he has any medical conditions before
14  you examine him?
15  A   Correct.  If there are some kind of
16  allergies, something like that.
17  Q   If someone had an injury to a
18  specific part of their body, say -- we will
19  use this example.
20      Say somebody was punched in the
21  head.  Would you then ask if they had any
22  history of head trauma or other -- other
23  injuries to their head?
24  A   Correct.

Page 38

1   Q   You would?
2   A   I would.
3   Q   And why is that?
4   A   Just to be sure there is not another
5   injury like that.
6   Q   To make sure that it may not be like
7   exacerbating or making worse the original
8   injury?
9   A   Correct.
10      MR. TRUBAC:  We will mark this as
11  Exhibit 2.
12      THE WITNESS:  This is the intake
13  process.
14  BY MR. TRUBAC:
15  Q   Did you have a chance to review all
16  these pages?
17  A   No.
18  Q   Just take a look at all three pages.
19  You don't need to read them in detail.
20      I think you were saying that
21  this is typically an intake form or pages
22  taken from a typical intake form?
23  A   Correct.
24  Q   So when we were talking before about

Page 39

1   how when an inmate comes into Stateville and
2   they have a known medical condition, they
3   would be seen immediately for a physical
4   examination, is this the type of form that
5   would be filled out for those cases?
6   A   Right.
7   Q   And so it looks like -- first of all,
8   let me ask you this.
9       Did you fill out any of these
10  forms?  Do you recognize your signature on any
11  of these forms?
12  A   Yes.  This is the form.
13  Q   Are any of these signatures yours?
14  A   This is my signature.
15  Q   Bates labeled Johnson 00036?
16  A   Yes.  This has the intake already.
17  Q   So this is your signature at the
18  bottom of this form?
19  A   Right.
20  Q   Okay.
21      And this is dated March 4, 2014;
22  is that correct?
23  A   Correct.
24  Q   And this is for Cedric Johnson who is

Page 40

1   the Plaintiff in this action?
2   A   Correct.
3       MR. TRUBAC:  And just for the record,
4   Exhibit 1 was also an offender injury report
5   for Cedric Johnson dated March 10, 2014.
6       MR. KOPPENHOEFER:  So let me just
7   sort of clarify.  The first page of the
8   exhibit was prepared by a nurse.
9       MR. TRUBAC:  Yes.
10      So these pages may not be
11  necessarily part of the same document.  These
12  are forms we received, medical records for
13  inmate Cedric Johnson that were all dated the
14  same day.  That's why they are stapled
15  together, but they are not necessarily all
16  from the same document.
17      As Counsel was saying, the first
18  page was signed by a registered nurse.  The
19  second might be from a completely different
20  form.  That's possible.
21      THE WITNESS:  Yes.  This is all
22  intake documents.
23  BY MR. TRUBAC:
24  Q   Do you recognize the third page of



**EXHIBIT B**

EVARISTO AGUINALDO, M.D.
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO

July 11, 2017
41—44

Page 41

1  this document, Bates labeled Johnson 00037?
2       MR. KOPPENHOEFER:  He wants to know
3  if you recognize the form, or this document.
4  BY MR. TRUBAC:
5     Q    Yes.  You had mentioned that your
6  signature is on the bottom of the second page?
7     A    Correct.
8     Q    Did you fill out this second page?
9     A    Yes.
10    Q    Did you also fill out this third
11  page?
12    A    Yes.  That is the one.
13    Q    So the second page and third page are
14  all part of the same document?
15    A    Yes.
16    Q    Is there any reason why the intake
17  would be done by both a registered nurse,
18  which is on the first page, and then --
19    A    This is the nurse, when they start
20  the screening process -- because she get the
21  history, and they report the history here,
22  like high blood pressure and seizure, and this
23  is the type of patient we have to see right
24  away after the screening process.

Page 42

1     Q    So this first page is like an initial
2  screening?
3     A    Right, but for the nurse.
4     Q    And then if -- because of what is
5  written on this form, it looks like he needs
6  to be seen right away, meaning he needs to be
7  seen by a medical doctor?
8     A    Yes.
9     Q    So would you review this first form
10  before then filling out these second two
11  pages?
12    A    Yes.
13    Q    So I know that you didn't complete
14  the first form, but my knowledge of medical
15  acumen is not so great.
16         On the first page, do you see
17  where it says surgeries in the middle of the
18  page?
19    A    Gunshot wound --
20       MR. KOPPENHOEFER:  Wait for the
21  question.
22  BY MR. TRUBAC:
23    Q    It says GSW in back, I think.
24         Does GSW stand for gunshot

Page 43

1  wound?
2     A    Gunshot wound in the back.
3     Q    And I think it says in the back of
4  head?
5     A    In the back and head.
6     Q    And it looks like slash 90.
7         Do you understand that to mean
8  1990's?
9     A    Correct.
10    Q    And right underneath that it says HX
11  of being beaten in the head with baseball
12  bat.
13         Does HX mean history?
14    A    Yes.
15    Q    And under recent drug, slash, ETH
16  use, it says HX of seizures due to alcohol
17  use.
18         Does that mean history of
19  seizures due to alcohol use?
20    A    Correct.
21    Q    And then under behavioral,
22  appearance, under the objective of the form,
23  near the middle, where it says behavioral,
24  appearance, hearing loss, mental status,

Page 44

1  trauma and skin condition, it says, needs
2  glasses, and no open skin areas present; is
3  that correct?
4         I know you didn't write that.
5       MR. KOPPENHOEFER:  He is talking
6  about right here (indicating).
7       THE WITNESS:  It says needs glasses.
8       MR. KOPPENHOEFER:  Zero.
9       THE WITNESS:  No open wound. .
10      MR. KOPPENHOEFER:  In other words,
11  that's a zero in front.
12      THE WITNESS:  No open wounds.
13      MR. KOPPENHOEFER:  All right.
14  BY MR. TRUBAC:
15    Q    And then under assessment on the
16  third line, it says -- has something of
17  seizures and then it looks like HTN.
18         Is that hypertension?
19    A    Hypertension.  HTN.
20    Q    And then the next line?
21    A    See above notes.
22    Q    Thank you.  You can read this way
23  better than I can.
24         Let's move to the second page

ESQUIRE
DEPOSITION SOLUTIONS

**EXHIBIT B**

EVARISTO AGUINALDO, M.D.                         July 11, 2017
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO              45–48

Page 45

1  then.  So my understanding is you filled out
2  this second and third page after reviewing the
3  first page, correct?
4     A    Correct.
5     Q    Now, I see a bunch of handwritten
6  notes that look like they say WNL.  Is that
7  within normal limits?
8     A    Correct.  Within normal limits.
9     Q    Under lungs and chest, including
10 breast, CTA, what does that stand for?
11    A    Clear to auscultation.  Clear to
12 auscultation when you try to hear the lungs.
13    Q    And then under assessment, can you
14 read us what your notes say?
15    A    No known allergy.  Ethanol and drug
16 abuse.  Self-reported back pain.  History of
17 seizure disorder secondary to ethanol abuse.
18 No medication taken.  History of high blood.
19 No other problem at this time.
20    Q    And then on the third page on the
21 bottom, do you see where it says past
22 hospitalizations on the bottom?  Do you see
23 that?
24    A    Right.  I see it.

Page 46

1     Q    You have to answer.
2          Did you also fill out this
3  section right here?
4     A    Yes.  I asked him these questions.
5     Q    And so tell me if I am incorrect, but
6  this says diagnosis, gunshot wound to head and
7  back?
8     A    Back and head.
9     Q    In the 1990's.
10         Then another diagnosis for head
11 trauma; and, what is that?
12    A    Secondary to accident.
13    Q    Also in the 1990's.
14         Okay.  What would happen to this
15 intake form after you filled it out?
16    A    After we fill this out, then he would
17 be followed.  In case they get another
18 problem, they go for sick call.
19    Q    What would happen to this form?
20 Where would it be stored?
21    A    We just deliver the medication so --
22    MR. KOPPENHOEFER:  He wants to know
23 what happens to the papers.
24

Page 47

1  BY MR. TRUBAC:
2     Q    Right.
3          Do they get filed in the
4  healthcare unit or something?
5     A    Yes.
6     Q    Do you have access to the papers
7  after they are filed?
8     A    We have access.
9     Q    So if an inmate is taken to the
10 healthcare unit, you mentioned that normally
11 you wouldn't be able to -- normally you don't
12 see a document like this before you examine a
13 patient, correct?
14    MR. KOPPENHOEFER:  Well, that was
15 when they were brought down for an injury.
16    MR. TRUBAC:  I'm sorry.  I will
17 clarify.
18    Q    You said before if an inmate is
19 brought into the healthcare unit for an injury
20 and they need to be seen by a physician right
21 away, normally you wouldn't see this type of
22 report?
23    A    Not normally we don't.
24    Q    But you have access to it?

Page 48

1     A    We have access.
2     Q    How long would it take to find this
3  report?
4     A    I really don't know.
5     MR. TRUBAC:  Okay.
6          Let's move on to -- we will mark
7  Exhibit 3, and then I will ask you to take a
8  look at it and see if you recognize it.
9          (Document marked Exhibit 3
10         for Identification.)
11 BY MR. TRUBAC:
12    Q    Take a look at this document and tell
13 me if you recognize it.
14    A    Yes.
15    Q    What is this?
16    A    This is my penmanship.  I see him
17 after he get into a fight with his cellmate.
18    Q    This is your report of Cedric
19 Johnson, the Plaintiff, after he was taken to
20 the healthcare unit after his reported fight
21 with his cellmate; is that correct?
22    A    I didn't get your --
23    Q    Sure.
24         Am I correct that this is your

ESQUIRE
DEPOSITION SOLUTIONS

**EXHIBIT B**

EVARISTO AGUINALDO, M.D.                                July 11, 2017
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO           49—52

Page 49

1  notes of your examination of the Plaintiff,
2  Cedric Johnson, after you examined him at the
3  healthcare unit on March 10, 2014, after his
4  fight with his cellmate?
5  A  Correct.
6  Q  That's correct?
7  A  Yes.
8  Q  Okay.  Just to clarify, I think in
9  the answer to your interrogatories, you
10 certified that your signature is at the bottom
11 of this page.  I think it might be that
12 scribble; is that correct?
13 A  Yes.  That's my scribble.
14 Q  And I believe there is another
15 signature underneath that.  It looks like it
16 is signed by a CMT, certified medical
17 technician?
18 A  Probably.
19 Q  Are these forms always signed by more
20 than one person?
21 A  My signature?
22 Q  No.  You fill out this form and you
23 sign it?
24 A  Correct.

Page 50

1  Q  But there are two signatures on this
2  page.
3      Are these forms always signed by
4  two people, or --
5  A  Probably one.  One people.
6  Q  But in this case, there happened to
7  be two?
8  A  Correct.
9      MR. KOPPENHOEFER:  Do you want him to
10 explain why?
11     MR. TRUBAC:  If you want him to, you
12 can explain why.
13     THE WITNESS:  Whenever we do
14 something, it has to be countersigned by a med
15 tech or a nurse so we can file it.
16 BY MR. TRUBAC:
17 Q  So it's really for filing purposes?
18 A  Correct.
19 Q  I apologize, but I am going to ask
20 you to just read out just because it is
21 difficult to read the handwriting.
22     MR. KOPPENHOEFER:  Are you done with
23 your question?
24     MR. TRUBAC:  Yes.

Page 51

1      I'm not sure what the easiest
2  way there is to read it because there are
3  three columns, so whatever way makes the most
4  sense to you, if you would read what you have
5  written here for us.
6      Take your time and speak real
7  clearly so she can get everything down.
8      MR. TRUBAC:  If you can't understand
9  your own handwriting, don't make something up.
10     THE WITNESS:  I saw him on 3-10 --
11     MR. KOPPENHOEFER:  Don't describe
12 it.  Read it.
13     MR. TRUBAC:  Why I want you to do
14 this is so we can get an understanding of what
15 this document says.  So just read verbatim,
16 word for word what it says.
17     THE WITNESS:  Okay.
18     S, subjective, claim had
19 altercation with his cellie this morning and
20 was hit in the face.  Now claim hurt, left eye
21 and blurry.  O, objective, alert, not in
22 distress.  Left orbit, superficial laceration
23 noted on the -- inside the lid.  Superficial
24 laceration noted on the inside of the lid,

Page 52

1  upper eye, about two to three millimeter in
2  size; two to three millimeter in size.  Also
3  abrasion superior noted around the orbit.
4  Unable to check eye due to swelling.  Right
5  orbit lower orbit abrasion noted; and the
6  forehead, slight swelling, no tenderness.
7      MR. TRUBAC:  I'm sorry.  Where was
8  that?
9      MR. KOPPENHOEFER:  That is right
10 underneath the line with the O.
11     THE WITNESS:  Then assessment,
12 superficial laceration slash abrasion both
13 orbit secondary to trauma.
14 BY MR. TRUBAC:
15 Q  Does that conclude this column?
16 A  Right.
17 Q  And I guess, before you continue, so
18 on the left column where it says date and
19 time, 3-10-2014, then it says 8:10 a.m., is
20 that 8:10 in the morning?
21 A  Yes.  8:10 in the morning.
22 Q  Would that be when you were examining
23 Mr. Johnson, the Plaintiff?
24 A  Yes.



EXHIBIT B

EVARISTO AGUINALDO, M.D.                                              July 11, 2017
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO                              53–56

Page 53

1   Q   Looks like there was a blood pressure
2   reading and something else and underneath that
3   it says 12-18.  What is 12-18?
4   A   I think that could be respirations.
5   Q   I am glad you are here to decipher
6   for us.
7       So can you read the third
8   column, plans?
9   A   Plan is call IA, Internal Affairs.
10  X-ray, skull x-ray, and x-ray of left orbit.
11      We ordered bloodwork, RPR,
12  protein profile and HIV and tetanus
13  toxoid, IM stat.  Then Neosporin slash
14  Polysporin slash Bacitracin Ointment, apply to
15  the left eye two times a day for five days was
16  given.  Then follow-up two day slash PRN.
17  Q   What is PRN?
18  A   Whenever he --
19  Q   Oh, yes, you said that before.
20  A   Ice compress, Tylenol 325, two
21  tablets every four to six hours, number 16
22  given.
23  Q   So my understanding is that -- from
24  your notes is that you were unable to check

Page 54

1   Mr. Johnson's eyes because of the swelling,
2   correct?
3   A   Correct.
4   Q   So the plan was to have him follow-up
5   after two days, and you prescribed -- I think
6   you said -- was it Tylenol?
7   A   Tylenol.
8   Q   And also ointment to -- eye ointment
9   to apply to his left eye?
10  A   Yes.
11  Q   And what was the purpose for the
12  ointment?
13  A   Just for the abrasion to the eye, the
14  abrasion or the cut.
15  Q   Do you see where Mr. Johnson
16  complained of his left eye was blurry?
17  A   That's what he said.
18  Q   Underneath you said that you were
19  unable to check eyes.
20      When you say unable to check
21  eyes, I know that you mentioned you saw
22  lacerations on the eyelid.  What does it mean
23  unable to check eyes?
24  A   Because of the swelling eye, it was

Page 55

1   hard to examine the eye.
2   Q   So am I correct that it is likely
3   that his eyes -- left eye, or whichever eye
4   was so swollen that it was difficult to open
5   the eye to examine it?
6   A   It's possible.
7   Q   Is it likely?
8   A   Probable.
9   Q   But in any respect, you weren't able
10  to examine the actual eye during this
11  examination?
12  A   Correct.
13  Q   So when you ordered the follow-up
14  after two days, how does that work, scheduling
15  the follow-up visit?
16  A   We have a system where we will see
17  them the following day up to two weeks later,
18  so we see them.
19  Q   The follow-up after two days, is that
20  a follow-up with medical doctor, or might it
21  just --
22  A   Any provider.  Either me or the PA.
23  Q   So it could be a physician's
24  assistant.  Could it be a registered nurse?

Page 56

1   A   Or nurse practitioner?
2   Q   So it has to be at least a nurse
3   practitioner, or a physician's assistant?
4   A   Or me.
5   Q   Or you.
6       Are there any times when do you
7   an examination and you order a follow-up, and
8   you make sure that you are the one who does
9   the follow-up examination as opposed to a
10  nurse practitioner or physician assistant?
11  A   Well, since there are three of us,
12  anybody can see them.  If they have any
13  question, they can ask us.
14  Q   I know that this was a number of
15  years ago, but given that Mr. Johnson
16  complained of his left eye was blurry and then
17  you were unable to check his left eye because
18  of the swelling, given the trauma to his eye,
19  is it possible -- I'm not asking you to draw
20  any conclusions as to this particular case --
21  but is it possible that there could have been
22  serious injury to the eye that you couldn't
23  see because he couldn't open the eye?
24  A   It's possible.



**EXHIBIT B**

EVARISTO AGUINALDO, M.D.      July 11, 2017
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO      57–60

Page 57

1      MR. KOPPENHOEFER: Objection,
2 foundation, incomplete hypothetical; also,
3 speculation.
4      THE WITNESS: It's possible.
5 BY MR. TRUBAC:
6      Q   Is it -- in your knowledge as a
7 medical doctor, is it possible for someone to
8 develop symptoms -- is it possible for trauma
9 to the eye to be so serious that it causes
10 something like blindness or cataracts maybe or
11 something like that?
12      A   I don't know.
13      Q   You don't know?
14      A   I don't know.
15      Q   Is that because you are not an
16 ophthalmologist, or just because --
17      A   I really don't know. I really can't
18 answer.
19      Q   Do you ever order a follow-up -- do
20 you ever refer out an inmate for a follow-up
21 with a doctor who specializes in a certain
22 area?
23        So say in this case, you were
24 unable to check Mr. Johnson's eyes because of

Page 58

1 swelling, and you noted that he should have
2 additional follow-up after two days.
3        Would you ever because of the
4 nature of the injury, the eye injury, would
5 you order a follow-up with an opthalmologist?
6      A   Yes.
7      MR. KOPPENHOEFER: Object to
8 foundation. Calls for speculation, and it
9 assumes facts not in evidence.
10      MR. TRUBAC: You can answer.
11      THE WITNESS: Yes.
12 BY MR. TRUBAC:
13      Q   So in this case, where it says
14 follow-up after two days, was there a -- in
15 your experience as a doctor, would this be a
16 case where you would refer out Mr. Johnson to
17 be seen by an opthalmologist because of the
18 injury to his eye?
19      MR. KOPPENHOEFER: Same objection.
20      THE WITNESS: Not at the time that I
21 saw him.
22 BY MR. TRUBAC:
23      Q   And why is that?
24      A   Because it was only a superficial

Page 59

1 injury.
2      Q   So even though you couldn't examine
3 the eye --
4      A   Yes.
5      Q   So the swelling in the eye which
6 meant that you couldn't check it, that was
7 considered superficial.
8      MR. KOPPENHOEFER: Objection.
9 Argumentative. You can answer over his
10 objection. Go ahead.
11      THE WITNESS: Swelling meant -- just
12 like the eye -- like you cover the eye. You
13 could not see the eye socket because of the
14 impact, the injury.
15      MR. TRUBAC: This would be
16 Exhibit 4.
17      (Document marked Exhibit 4
18      for Identification.)
19 BY MR. TRUBAC:
20      Q   Take a look at this document and let
21 me know do you recognize the document?
22      A   Yes.
23      Q   What is this?
24      A   This is the x-ray I ordered of the

Page 60

1 left orbit.
2      Q   And that means for the left eye?
3      A   Yes.
4      Q   And I think this is the x-ray that
5 was ordered, and this x-ray was mentioned
6 specifically in Exhibit 3, under plan,
7 correct?
8      A   Yes.
9      Q   So this is the x-ray --
10      A   Result.
11      Q   Result.
12        And under referring physician on
13 the bottom, is that your signature, your name
14 and signature?
15      A   Correct.
16      Q   Did you fill out this form?
17      A   I filled out this form.
18      Q   And so same thing again because it is
19 difficult for me to read your handwriting.
20 This is the patient's name, Cedric Johnson.
21 Can you just read from examination requested
22 down?
23      MR. KOPPENHOEFER: Just to clarify,
24 the report part is by a different physician.

ESQUIRE
DEPOSITION SOLUTIONS

**EXHIBIT B**

EVARISTO AGUINALDO, M.D.                                    July 11, 2017
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO                    61—64

Page 61

1        Do you know what I mean?
2        MR. TRUBAC:  Let me ask the doctor.
3    BY MR. TRUBAC:
4        Q    So you signed this form at the
5    bottom, correct?
6        A    Correct.
7        Q    The rest of the form, patient name,
8    offender number, examination requested,
9    history of symptoms report, did you also fill
10   out that as well, or is that filled out by
11   someone else?
12       A    I filled out the history and
13   symptoms.
14       Q    Underneath that where it says report,
15   that was filled out by someone else?
16       A    That is the specialist, the
17   radiologist.
18       Q    Can you -- so request date, March 10,
19   2014, can you read to us history slash
20   symptoms, what that says?
21       A    Superficial abrasion, laceration,
22   left orbit, trauma of the forehead.
23       Q    Trauma of th4e forehead?
24       A    Trauma, yeah, forehead.

Page 62

1        Q    And then the report, that was filled
2    out by someone else, correct?
3        A    Yes.  The radiologists write their
4    report.
5        Q    So I know that you didn't fill this
6    out; but, again, GSW, I am assuming that means
7    gunshot wound?
8        A    Correct.
9        Q    And then the R that is circled, do
10   you have an understanding of what that means?
11       A    That is --
12       Q    If you don't --
13       A    Right occipital area.
14       Q    Let me ask you this.
15            What made you order this x-ray?
16   You examined Mr. Johnson and one of the things
17   you ordered was an x-ray.
18       A    Because of the history of trauma of
19   the face and the forehead.  Because of the
20   history of trauma.  That's why I have to order
21   this thing.
22       Q    So history of trauma, you are
23   referring to what Mr. Johnson told you during
24   the examination of the history of trauma to

Page 63

1    his head?
2        A    I don't understand.
3        Q    So when you said because of the
4    history of trauma, how did you know there was
5    a history of trauma?
6        A    He was involved in a fight.
7        Q    My understanding of a history of
8    trauma means there were events in the past
9    that also --
10           MR. KOPPENHOEFER:  History means five
11   minutes ago.
12           MR. TRUBAC:  Is that right?
13           THE WITNESS:  Yes.
14   BY MR. TRUBAC:
15       Q    So history of trauma doesn't
16   necessarily mean, you know, like --
17       A    Ten years ago.
18       Q    Okay.
19            So history of trauma could mean
20   this specific incident?
21       A    Correct.
22       Q    So the -- do you order -- would you
23   see this report after it was completed, after
24   Mr. Johnson had the x-ray taken?

Page 64

1        A    I did not see this report after it
2    was completed.
3        Q    Was it just filed away?
4        A    Somebody saw it.  I don't know who it
5    was.
6        Q    Would someone other than the
7    technician who filled this out, would someone
8    then read this report?
9        A    Someone would read the report.
10       Q    And if they noticed something, if
11   they noticed something -- all right.  Okay.
12            So you wouldn't see this
13   completed form after it was filled out?
14       A    I never see it.
15       Q    So you order the x-ray and fill out
16   the history and symptoms, and then you don't
17   see this form again, correct?
18       A    Correct.
19       Q    Is there a reason -- I apologize if I
20   am asking the same question I asked before,
21   but is there a reason why after you order an
22   x-ray you wouldn't then look -- you personally
23   then wouldn't look at the result?
24       A    There are two doctors.  Whoever is

**EXHIBIT B**

EVARISTO AGUINALDO, M.D.                                    July 11, 2017
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO                    65—68

Page 65

1  available can sign the x-rays. Whoever is
2  available.
3      Q   So it's possible that you would be
4  the doctor who would look at this after
5  follow-up, but it is also possible it could be
6  someone else; is that correct?
7      A   Correct.
8          MR. TRUBAC: I have one more exhibit.
9  Mark this as 5.
10         Take a look at this document and
11 let me know when you are finished reading it.
12         (Document marked Exhibit 5
13         for Identification.)
14 BY MR. TRUBAC:
15     Q   You have reviewed it?
16     A   I haven't read it.
17     Q   But you have looked at the document?
18     A   Correct.
19     Q   Is your signature on this document?
20 Did you fill out this document?
21     A   No.
22     Q   So do you recognize any of the
23 signatures on the bottom of this page?
24     A   I'm not very sure.

Page 66

1      Q   It looks like this was filled out on
2  March 14, 2014, correct?
3      A   Correct.
4      Q   And PA note, I am assuming, means
5  physician assistant?
6      A   Correct.
7      Q   So this looks to me to be notes from
8  a follow-up visit of Mr. Johnson after he had
9  the fight on the 10th?
10     A   Correct.
11     Q   And I think you said earlier that you
12 would have ordered a follow-up visit within
13 two days and that follow-up could have been
14 with anyone who was available at that time?
15     A   Correct.
16     Q   And so in this case, it looks like it
17 was a physician's assistant who saw
18 Mr. Johnson?
19     A   Correct.
20     Q   Dr. Aguinaldo, have you ever -- have
21 you ever seen this document before prior to
22 today?
23     A   No.
24     Q   So after you fill out the initial

Page 67

1  report and then there is a follow-up report,
2  what generally happens to the follow-up
3  report? They are just placed in the file for
4  the inmate?
5      A   Yes.
6      Q   Is there -- is there any either
7  procedure, or regulation, or something like
8  that where you who is the first person who
9  sees an inmate and fills out the initial form
10 we just looked at and then orders a follow-up,
11 do you ever review the follow-up notes since
12 you were the doctor who initially saw and
13 examined the patient?
14     A   No.
15     Q   And why not?
16     A   Because as I said again, for
17 follow-up, any provider can see him unless the
18 guy who see him ask a question. Then I will
19 talk to him.
20     Q   As a medical doctor -- when you were
21 in your private practice in the south side in
22 the -- was it the 1970's to the 1980's?
23     A   1979 to 2001.
24     Q   Was it just you, or were there other

Page 68

1  doctors in the practice?
2      A   I was the only physician.
3      Q   And just to reiterate, you are a
4  general practitioner. You don't have any --
5  you're not a specialist in any area, correct?
6      A   Correct.
7          MR. TRUBAC: That's all I've got.
8          MR. KOPPENHOEFER: Let's take a quick
9  break. Let's go off the record for a second.
10         (Brief recess.)
11         MR. KOPPENHOEFER: Back on the
12 record.
13          E X A M I N A T I O N
14 BY MR. KOPPENHOEFER:
15     Q   Doctor, turning to Exhibit 2, you saw
16 this gentleman when he came into the NRC on
17 March 4, 2014, true?
18     A   True.
19     Q   And you prescribed some medication
20 for him at that time?
21     A   Correct.
22     Q   What did you prescribe for him?
23     A   Norvasc, Metoprolol, Lisinopril, and
24 Doxazosin.



EXHIBIT B

Page 69

1    Q    And what is this?
2    A    Low bunk permit.
3    Q    And you gave him a permit to be on a
4   low bunk?
5    A    Permit.
6    Q    Now, the nurse does her own form, but
7   she reports some different things, too,
8   correct?
9    A    Correct.
10    Q    She reported that he had 2300 vision
11   in both eyes, correct?
12    A    That's correct.
13    Q    And he needs glasses?
14    A    Correct.
15    Q    Now, 2300 vision is poor, true?
16    A    True.
17    Q    And then your next interaction with
18   this gentleman would have been on March 10,
19   2014, true?
20    A    True.
21    Q    And that is when he was brought into
22   the healthcare unit based on an acute incident
23   when he was hit several times by his cellmate,
24   right?

Page 70

1    A    Right.
2    Q    And you described to us earlier as in
3   that particular situation the medical chart
4   would not be there with him, true?
5    A    True.
6    Q    At that time, there was no apparent
7   injury to the eye itself, true?
8    A    True.
9    Q    Nevertheless, you observed some
10   superficial injuries to the orbits.  That
11   means the bones around the eyes, right?
12    A    Yes.
13    Q    Well, the skin that covers the bones
14   around the eyes, correct?
15    A    Correct.
16    Q    And you saw some abrasions and some
17   swelling, right?
18    A    Correct.
19    Q    You could see the eye, but you
20   couldn't open up the eye all the way because
21   of the swelling; is that right?
22    A    Correct.
23    Q    Now to further investigate the
24   possibility of injury, you ordered an x-ray of

Page 71

1   the skull and the orbit, right?
2    A    Correct.
3    Q    And you were shown that earlier, the
4   requisition and the report are included in
5   Exhibit 4, true?
6    A    True.
7    Q    And the radiologist who interpreted
8   the x-ray on March 11 is Dr. Leef, correct?
9    A    Right.
10    Q    L-e-e-f.
11       And he found no new pathology,
12   true?
13    A    True.
14    Q    That  means there were no acute
15   injuries seen on those x-rays, right?
16    A    Right.
17       MR. TRUBAC:  Objection,
18   speculation -- hearsay.
19   BY MR. KOPPENHOEFER:
20    Q    He did, however, see fragments from a
21   bullet in the man's head, right?
22    A    Right.
23       MR. TRUBAC:  Objection.
24       I am just going to make a

Page 72

1   blanket hearsay objection to anything that the
2   specialist or the doctor found.
3       MR. KOPPENHOEFER:  Off the record.
4       (Discussion off the record.)
5   BY MR. KOPPENHOEFER:
6    Q    And to further evaluate, you asked a
7   follow-up appointment be scheduled in two days
8   or as needed, correct?
9    A    Correct.
10    Q    Meaning that Mr. Johnson could come
11   in earlier, if his symptoms got worse, true?
12    A    Correct.
13    Q    And the purpose of that was to take
14   another look at him after the swelling had
15   gone down, right?
16    A    Correct.
17    Q    To see if his symptoms had improved,
18   stayed the same, or gotten worse, correct?
19    A    Correct.
20    Q    You also ordered an ice compress for
21   him, right?
22    A    Correct.
23    Q    That is to help the swelling resolve?
24    A    Correct.

Page 73

1   Q   You also ordered Tylenol for pain?
2   A   Correct.
3   Q   And, in fact, he left the healthcare
4   unit that day with 16 tablets, true?
5   A   Correct.
6   Q   Because of the abrasions, which is
7   open skin, you ordered a tetanus shot and that
8   was given to him, true?
9   A   Correct.
10   Q   Now, when your note is countersigned,
11   that means that the nurse followed the orders,
12   right?
13   A   Correct.
14   Q   And I have another question about the
15   x-ray report.
16       So referring then to Exhibit 4,
17   in the lower right-hand corner there is
18   somebody's initials and the date of March 11,
19   2014, right?
20   A   Right.
21   Q   That means some other doctor reviewed
22   that, right?
23   A   Correct.
24   Q   In other words, Dr. Leef issued his

Page 74

1   interpretation, and this was seen and signed
2   off on by a doctor at the healthcare unit?
3   A   Correct.
4   Q   You don't recognize those initials;
5   is that true?
6   A   No.
7   Q   But that's what that means; is that
8   correct?
9   A   Yes.
10   Q   By the way, the staff in the
11   healthcare unit operate as a team; is that
12   correct?
13   A   Correct.
14   Q   So you don't have your own individual
15   patients that are permanently assigned to you
16   in the prison; is that true?
17   A   Correct.
18   Q   One doctor, physician assistant,
19   nurse, picks up on what you have both done and
20   anybody can take over on a particular day?
21   A   Correct.
22   Q   Now, then the patient is scheduled
23   for the follow-up as you requested, and he
24   comes in on March 14, 2014, true?

Page 75

1   A   True.
2   Q   And he is seen by a physician
3   assistant, right?
4   A   Right.
5   Q   And that is consistent with your
6   plan, right?
7   A   Correct.
8   Q   That physician assistant also made
9   some orders for him, true?
10   A   Correct.
11   Q   And, by the way, a physician
12   assistant makes orders just like a doctor,
13   right?
14   A   Correct.
15   Q   The only difference is she is working
16   under the supervision of a doctor?
17   A   Correct.
18   Q   Do you know who the supervising
19   physician is?
20   A   I don't know.
21   Q   So she ordered Metoprolol?
22   A   Correct.
23   Q   Naprosyn?
24   A   Correct.

Page 76

1   Q   And Naprosyn is an anti-inflammatory?
2   A   Correct.
3   Q   And that is used to reduce pain?
4   A   Correct.
5   Q   And swelling perhaps?
6   A   Correct.
7   Q   And she also asked for a follow-up
8   with optometry, correct?
9   A   Correct.
10   Q   And she put in parenthesis here
11   Stateville; and, that means over here?
12   A   Probably over here.
13   Q   And what did you call that again?
14   A   Stateville proper.
15   Q   So there is an optometrist that works
16   here, right?
17   A   Correct.
18   Q   Now, in her notes, the physician
19   assistant has got S slash R improving, right?
20       Do you see that?
21   A   That's what she said.
22   Q   And that means the patient has
23   self-reported that his eye condition is
24   improving; is that true?

EVARISTO AGUINALDO, M.D.                                    July 11, 2017
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO                     77–80

Page 77

1    A   True.
2    Q   So, presumably, four days later now,
3  the swelling has eased somewhat, and she is
4  able to get a better look at his eye; is that
5  right?
6    A   Possible.
7    Q   By the way, if you had asked somebody
8  else to take a look at Mr. Johnson on
9  March 10, they would have encountered the same
10  situation as you did where it was hard to get
11  his eyes all the way open because of the
12  swelling, right?
13    A   Yes.
14    Q   When you saw Mr. Johnson on March 10,
15  did he complain of spots in his vision?
16    A   Repeat the question.
17    Q   When you saw Mr. Johnson on March 10,
18  did he complain of spots in his vision?
19    A   No.  Not according to my note.
20    Q   If he had, you would have documented
21  it, right?
22    A   Correct.
23    Q   Did he complain of headaches to you
24  on that date?

Page 78

1    A   He didn't say anything about
2  headaches according to my note.
3    Q   Did you have any ill will toward
4  Mr. Johnson?
5    A   No, sir.
6    Q   Do you now?
7    A   No, sir.
8    Q   Do you have any desire to punish
9  Mr. Johnson?
10    A   No, sir.
11    Q   By the way, as far as you know,
12  March 10, 2014, is the last time you had any
13  involvement in the care of Mr. Johnson, true?
14    A   True.
15    Q   When you issued your orders on that
16  day, you would have been relying on other
17  medical staff personnel to carry out those
18  orders and plans, true?
19    A   True.
20    Q   In terms of scheduling the follow-up
21  appointment, there are people that handle
22  scheduling, true?
23    A   Correct.
24    Q   Someone puts him on a list to be seen

Page 79

1  and somebody fills out a pass to have him
2  brought down to the healthcare unit, correct?
3    A   True.
4    Q   There is pharmacy personnel that
5  fills out the prescriptions, right?
6    A   Right.
7    Q   There are nurses that administer the
8  medications, right?
9    A   True.
10    Q   Once you enter those orders, it is
11  your anticipation that those orders will be
12  carried out, true?
13    A   Correct.
14    Q   I want to clear something up.
15        When someone comes down to the
16  healthcare unit, they don't always need to be
17  seen by a medical doctor, true?
18    A   True.
19    Q   Some conditions, for example, if a
20  patient appears to have a cold, might be
21  handled by a nurse, right?
22    A   Correct.
23    Q   The physician assistant we already
24  talked about operates almost at essentially at

Page 80

1  the same level as a physician, right?
2    A   Correct.
3    Q   She can prescribe medication, right?
4    A   Correct.
5    Q   Same with a nurse practitioner,
6  right?
7    A   Correct.
8    Q   When you see patients, it is
9  basically because they are brought in to see
10  you by a nurse who has triaged the patient or
11  because they are on a schedule that someone
12  has put them on to be seen by you, right?
13    A   Right.
14    Q   Doctors don't go through the medical
15  records storage room looking through files, do
16  they?
17    A   No.
18    Q   That was true basically -- that was
19  basically true in practice inside the prison
20  and outside of the prison, correct?
21    A   Right.
22        MR. TRUBAC:  Objection, speculation.
23
24




**EXHIBIT B**

EVARISTO AGUINALDO, M.D.                                July 11, 2017
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO                    81–84

Page 81

1  BY MR. KOPPENHOEFER:
2      Q    When a patient comes in for an
3  appointment, there are staff members who
4  typically have the chart available and bring
5  it in for the doctor to see, correct?
6      A    Correct.
7      Q    When the patient comes into the
8  emergency room, because of the emergent nature
9  of their arrival that often is not there,
10  right?
11      A    Correct.
12      Q    When you saw Mr. Johnson on March 10,
13  2014, in your judgment there was no need for
14  an additional referral beyond all the orders
15  that you entered on that day, true?
16      A    True.
17      Q    You certainly weren't ruling out any
18  sort of further injury.  In fact, you were
19  exploring the possibility of that, correct?
20      A    Correct.
21      Q    If Mr. Johnson had some lasting
22  injury that he incurred on March 10, 2014, is
23  it your opinion that it was caused by the
24  fight he was in and not some failure to

Page 82

1  provide care on your part?
2      A    Correct.
3      Q    And that is an opinion you hold to a
4  reasonable degree of medical certainty, true?
5      A    Correct.
6      Q    You were asked before about an
7  ophthalmologist, and I JUST want to be clear.
8  It is an optometrist that is here on site,
9  right?
10      A    Correct.
11      Q    So, typically, if a patient has an
12  eye issue, he is seen by an optometrist,
13  correct?
14      A    Right.
15      Q    Which in laymen's terms is an eye
16  doctor, right?
17      A    Yes, absolutely.
18      Q    So if you are making a referral for
19  someone to see an eye doctor, it is to an
20  optometrist, right?
21      A    Correct.
22          MR. KOPPENHOEFER:  Nothing else.
23          Anything?
24          MR. TRUBAC:  Just one or two.

Page 83

1      F U R T H E R   E X A M I N A T I O N
2  BY MR. TRUBAC:
3      Q    So you were looking at Exhibit 3
4  before when your counsel was asking you some
5  questions.  I believe either he or you said at
6  the time of your report there was no apparent
7  injury to his eye; is that correct?
8      A    Correct.
9      Q    And at the same time you said that
10  you couldn't check his eye because it was
11  swollen, correct?
12      A    Correct.
13      Q    And you also provided an opinion that
14  if there was, in fact, any damage to
15  Mr. Johnson's eye or head, stemming from the
16  initial fight, that your opinion is that
17  was caused by the fight itself rather than any
18  failure to provide medical care, correct?
19      A    Correct.
20      Q    But you also said you were not a
21  specialist in eyes and don't really have a
22  background as an optometrist, correct?
23      A    Correct.
24          MR. KOPPENHOEFER:  We will reserve.

Page 84

1          MR. TRUBAC:  PDF.
2          MR. KOPPENHOEFER:  I would like an
3  E-tran with the exhibits, please.
4          (AND FURTHER DEPONENT SAITH NOT.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



EXHIBIT B

---

**Page 85**

```
 1   STATE OF ILLINOIS )
                       ) SS.
 2   COUNTY OF COOK    )

 3

 4          I, RENEE C. KERR, a Certified
 5   Shorthand Reporter in and for the County of
 6   Cook and State of Illinois, do certify that
 7   heretofore on, to-wit, July 11, 2017,
 8   personally appeared before me at
 9   16830 Broadway Street, Joliet, Illinois,
10   EVARISTO AGUINALDO, M.D., produced for
11   examination in said cause.
12          I further certify that the said
13   witness, EVARISTO AGUINALDO, M.D., was by me
14   first duly sworn to testify the truth, the
15   whole truth and nothing but the truth in the
16   cause aforesaid before the taking of the
17   deposition; that the testimony was reduced to
18   writing in the presence of said witness by
19   means of machine shorthand and afterwards
20   transcribed into typewriting, and that the
21   foregoing is a true and correct transcript of
22   the testimony given by said witness.
23          I further certify that there were
24   present at the taking of the deposition
```

**Page 86**

```
 1   MR. STEVEN G. TRUBAC, on behalf of the
 2   Plaintiff; and, MR. JOEL M. KOPPENHOEFER, on
 3   behalf of the Defendant.
 4          I further certify that I am not
 5   counsel for nor in any way related to any of
 6   the parties to this suit, nor am I in any way
 7   interested in the outcome thereof.
 8          I further certify that my
 9   certificate annexed hereto applies to the
10   original and typewritten copies only, signed
11   and certified transcripts only.  I assume no
12   responsibility for the accuracy of any
13   reproduced copies not made under my control or
14   direction.
15          In testimony whereof, I have
16   hereunto set my hand this 4th day of
17   August, 2017.
18
19
20   _____
                CSR No. 084-001508
21
22
23
24
```

**Page 87**

```
 1              DEPOSITION ERRATA SHEET

 2

 3

 4   Our Assignment No. J0602783
 5   Case Caption: CEDRIC LYN JOHNSON
 6   vs. EVARISTO AGUINALDO

 7

 8      DECLARATION UNDER PENALTY OF PERJURY
 9         I declare under penalty of perjury
10   that I have read the entire transcript of
11   my Deposition taken in the captioned matter
12   or the same has been read to me, and
13   the same is true and accurate, save and
14   except for changes and/or corrections, if
15   any, as indicated by me on the DEPOSITION
16   ERRATA SHEET hereof, with the understanding
17   that I offer these changes as if still under
18   oath.
19         Signed on the _____ day of
20   _____, 20___.
21
22   _____
23         EVARISTO AGUINALDO, M.D.
24
```

**Page 88**

```
 1              DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
                                              _____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24         EVARISTO AGUINALDO, M.D.
```



EVARISTO AGUINALDO, M.D.                                    July 11, 2017
CEDRIC LYN JOHNSON vs EVARISTO AGUINALDO                          89

Page 89

```
 1              DEPOSITION ERRATA SHEET
 2      Page No._____Line No._____Change to:_____
 3      _____
 4      Reason for change:_____
 5      Page No._____Line No._____Change to:_____
 6      _____
 7      Reason for change:_____
 8      Page No._____Line No._____Change to:_____
 9      _____
10      Reason for change:_____
11      Page No._____Line No._____Change to:_____
12      _____
13      Reason for change:_____
14      Page No._____Line No._____Change to:_____
15      _____
16      Reason for change:_____
17      Page No._____Line No._____Change to:_____
18      _____
19      Reason for change:_____
20      Page No._____Line No._____Change to:_____
21      _____
22      Reason for change:_____
23      SIGNATURE:_____DATE:_____
24              EVARISTO AGUINALDO, M.D.
```

ESQUIRE
DEPOSITION SOLUTIONS

**EXHIBIT B**